UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X     Case No.: 1:20-cv-1373 (DNH/CFH)
NATALIA FERRANDO-DEHTIAR,

                        Plaintiff,

      -against-

ANESTHESIA GROUP OF ALBANY, P. C.,
PETER ANDRIAKOS, Individually,
DERRICK R. WURL, Individually,
and LANCE WILKINS, Individually,

                    Defendants.
-------------------------------------------------------------------X

**Complaint**

**Plaintiff Demands a
Trial by Jury**

    Plaintiff, by Plaintiff's attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW,

PLLC, hereby complains of the Defendants, upon information and belief, as follows:

### Introduction

1.    Plaintiff Natalia Ferrando-Dehtiar, M.D., is a hard-working and dedicated anesthesiologist who devoted more than 10 years of her life to Defendant ANESTHESIA GROUP OF ALBANY, P.C., a medical practice controlled exclusively by a group of as many as 22 men—the Partners. Notwithstanding her education, experience, tenure, and qualifications, she never had a chance of becoming Partner, simply due to her gender. Plaintiff did everything she could to advance her career. She even endured sexual harassment from a Partner but kept silent so as not to impede any Partnership opportunity in a male-dominated workplace with an imbalanced power dynamic. After all hope of promotion was exhausted, Plaintiff finally stood up for herself in the face of sexual harassment and gender-based discrimination. Defendants terminated her in retaliation. Worse yet, notwithstanding Plaintiff's tireless hours risking her own health and safety working with COVID-19 patients, Defendants used the Pandemic as a pretext for her termination.

**Nature of the Case**

2.    Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; the New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 296, *et seq.*; and the New York Common Law. Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of Plaintiff's sex/gender (female). Defendants failed to promote Plaintiff into a Partnership Position for which she was qualified—and into which similarly-situated but less-qualified men were placed. Further, Plaintiff suffered sexual harassment at the hands of her supervisor. Defendants then retaliated against Plaintiff for objecting to discrimination on the basis of her sex/gender and ultimately unlawfully terminated Plaintiff.

**Jurisdiction and Venue**

3.    Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3).

4.    This Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

5.    Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3), as it is a judicial district in the State (New York) in which the unlawful employment practices are alleged to have been committed.

**Procedural Prerequisites**

6.    Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

7.    Plaintiff received a Notice of Right to Sue ("Notice") from the EEOC, dated September 29, 2020, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto as Exhibit A.

2

8.     This Action is being commenced within ninety (90) days of receipt of said Notice.

**Parties**

9.     At all times material, Plaintiff was a resident of Saratoga County, New York.

10.    At all times material, Defendant ANESTHESIA GROUP OF ALBANY, P. C. ("AGA") was a domestic professional corporation operating in and existing under the laws of the State of New York.

11.    At all times material, Defendant AGA was engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e.

12.    At all times material, Defendant AGA had 15 or more employees for each working day in each of 20 or more calendar weeks in 2020.

13.    At all times material, Defendant AGA had 15 or more employees for each working day in each of 20 or more calendar weeks in 2019.

14.    At all times material, Defendant AGA had 15 or more employees for each working day in each of 20 or more calendar weeks in 2018.

15.    At all times material, Defendant AGA had 101 or more employees for each working day in each of 20 or more calendar weeks in 2020.

16.    At all times material, Defendant AGA had 101 or more employees for each working day in each of 20 or more calendar weeks in 2019.

17.    At all times material, Defendant AGA had 101 or more employees for each working day in each of 20 or more calendar weeks in 2018.

18.    At all times material, Defendant AGA was Plaintiff's employer under Title VII.

19.    At all times material, Defendant AGA was Plaintiff's employer under the NYSHRL.

20. At all times material, Defendant PETER ANDRIAKOS ("ANDRIAKOS") was an employee of Defendant AGA and worked as an anesthesiologist.

21. At all times material, upon information and belief, "Partners" at AGA were entitled to higher salaries than other employees, more vacation, and greater decision-making authority, among other benefits.

22. At all times material, upon information and belief, Partners held ownership stakes in Defendant AGA and were entitled to a share of Defendant AGA's annual profits.

23. At all times material, Defendant ANDRIAKOS was a Partner at Defendant AGA.

24. At all times material, Defendant ANDRIAKOS was Plaintiff's supervisor and had supervisory authority over Plaintiff.

25. At all times material, Defendant ANDRIAKOS had the power to hire Plaintiff.

26. At all times material, Defendant ANDRIAKOS had the power to fire Plaintiff.

27. At all times material, Defendant ANDRIAKOS had the power to demote Plaintiff.

28. At all times material, Defendant ANDRIAKOS had the power to promote Plaintiff.

29. At all times material, Defendant ANDRIAKOS had the power to directly affect the terms and conditions of Plaintiff's employment.

30. At all times material, Defendant ANDRIAKOS had the power to direct Plaintiff's daily work activities.

31. At all times material, Defendant DERRICK WURL ("WURL") was an employee of Defendant AGA and worked as an anesthesiologist.

32. At all times material, Defendant WURL was a Partner at Defendant AGA.

33. At all times material, Defendant WURL was Plaintiff's supervisor and had supervisory authority over Plaintiff.

34. At all times material, Defendant WURL had the power to hire Plaintiff.

35. At all times material, Defendant WURL had the power to fire Plaintiff.

36. At all times material, Defendant WURL had the power to demote Plaintiff.

37. At all times material, Defendant WURL had the power to promote Plaintiff.

38. At all times material, Defendant WURL had the power to directly affect the terms and conditions of Plaintiff's employment.

39. At all times material, Defendant WURL had the power to direct Plaintiff's daily work activities.

40. At all times material, Defendant LANCE WILKINS ("WILKINS") was an employee of Defendant AGA who worked as an anesthesiologist.

41. At all times material, Defendant WILKINS was a Partner at Defendant AGA.

42. At all times material, Defendant WILKINS was Plaintiff's supervisor and had supervisory authority over Plaintiff.

43. At all times material, Defendant WILKINS had the power to hire Plaintiff.

44. At all times material, Defendant WILKINS had the power to fire Plaintiff.

45. At all times material, Defendant WILKINS had the power to demote Plaintiff.

46. At all times material, Defendant WILKINS had the power to promote Plaintiff.

47. At all times material, Defendant WILKINS had the power to directly affect the terms and conditions of Plaintiff's employment.

48. At all times material, Defendant WILKINS had the power to direct Plaintiff's daily work activities.

49. Defendant ANDRIAKOS, Defendant WURL, and Defendant WILKINS are collectively referred to herein as "Individual Defendants."

50. Defendant AGA and Individual Defendants are, at times, collectively referred to herein as "Defendants."

## Material Facts

51. In or around 1998, Plaintiff earned her M.D. from the Dnipropetrovsk Medical Academy in Ukraine.

52. Plaintiff then worked as an obstetrician in Dnipropetrovsk, Ukraine for approximately 2 years.

53. In or around 2000, Plaintiff immigrated to the United States.

54. From approximately 2005 to approximately 2009, Plaintiff studied at and participated in an anesthesiology residency with the State University of New York ("SUNY") at Buffalo, where she developed extensive skills in regional anesthesiology.

55. In or around 2009, Plaintiff completed her residency in anesthesiology from SUNY at Buffalo.

56. In or around 2009, Defendant ANDRIAKOS interviewed Plaintiff for an anesthesiologist position with Defendant AGA.

57. According to its website, Defendant AGA "is the largest anesthesia group in the Albany-Saratoga region of Upstate New York," and its mission is to "promote excellence in anesthesia care while providing comprehensive and compassionate services for our patients, facilities, referring physicians, and community."[1]

58. During the interview, Plaintiff asked if she could potentially become a Partner if she joined Defendant AGA.

---

[1] Anesthesia Group of Albany, About Us, https://www.agapc.com/about-us/ (last accessed October 29, 2020).

59. Defendant ANDRIAKOS responded in the affirmative.

60. Defendant ANDRIAKOS also indicated that Defendants would promote the most qualified individuals to open "Partnership Positions."

61. In addition, during Plaintiff's interview, Defendant ANDRIAKOS said that experience in cardiac anesthesiology would increase Plaintiff's chances of becoming a Partner.

62. Defendant ANDRIAKOS further explained to Plaintiff during her interview that Defendants would consider factors including dedication to Defendant AGA, how often candidates were on call, seniority, demonstrated skills and efficiency, and support for Defendant AGA's needs.

63. In or around September of 2009, Plaintiff began working as an anesthesiologist for Defendant AGA.

64. Initially, Plaintiff earned a base salary of approximately $350,000 per annum working for Defendants as a board-certified anesthesiologist, before bonuses and/or benefits.

65. Over the course of her employment, Defendants recognized and rewarded Plaintiff for her consistently excellent performance and effort by giving her several raises.

66. By May 2020, Plaintiff earned a base salary of approximately $490,000 per annum working for Defendants as a board-certified anesthesiologist, before bonuses and/or benefits.

67. Plaintiff was qualified for her position.

<u>Plaintiff Begins Her Struggle to Make Partner</u>

68. From the moment she was hired, Plaintiff threw herself into her work with vim and vigor, ever mindful of the prospect of a Partnership Position.

69. Initially, Plaintiff primarily worked at Saratoga Hospital in Saratoga Springs, New York.

70. Accordingly, Plaintiff and her family relocated to Saratoga, New York, from Buffalo, New York.

71. Upon information and belief, at the time, Defendant AGA had approximately 18 Partners, all of whom were male.

72. Upon information and belief, at the time she was hired, approximately 9 physicians were employed by Defendant AGA in non-partnership positions, and 8 of these physicians were female.

73. Plaintiff worked under a series of contracts that each covered a period of approximately 3 years.

74. Under the terms of her employment with Defendant AGA, in addition to her regular schedule, Plaintiff frequently was "on call," meaning she needed to be reachable by a given facility.

75. In other words, while on call, Plaintiff was required to present herself at the facility within 30 minutes of being paged or called.

76. On weekends, Plaintiff was often on call for approximately 48 hours.

77. During the week, an on-call shift would often last 24 hours.

78. In practice, this meant that Plaintiff needed to either live within 30 minutes' driving distance of the facility or remain at the facility while on call.

79. Plaintiff was on call more frequently than was required by her employment contracts.

80. Upon information and belief, Plaintiff was on call more frequently than most of the other physicians working for Defendants.

81. Initially, Plaintiff was scheduled for on-call shifts at Saratoga Hospital and/or Saratoga Surgery Center (together, the "Saratoga Facilities").

82. In or around late 2011, Plaintiff and Defendant ANDRIAKOS negotiated an approximately 3-year contract (the "2011 Negotiation").

83. During the 2011 Negotiation, Defendant ANDRIAKOS asked Plaintiff to change the facility where she was working from Saratoga Hospital to Samaritan Hospital in Troy, New York.

84. However, Plaintiff lived too far from Samaritan Hospital to stay at home with her family while she was on call.

85. Nonetheless, Plaintiff agreed to the transfer, and Plaintiff and her family relocated closer to Samaritan Hospital so she could be with her family while on call.

86. This was the second time that Plaintiff and her family relocated to accommodate her career with Defendants.

87. However, in or around 2012, Defendants later requested that Plaintiff resume "taking calls" from the Saratoga Facilities on some weekdays.

88. Also, during the 2011 Negotiation, Plaintiff asked Defendant ANDRIAKOS what she could do to advance her goal of becoming a Partner.

89. Defendant ANDRIAKOS indicated that Dr. Paul Chalmers and Dr. Thomas Kennedy, other Defendant AGA Partners, would be the next Partners to retire.

90. Upon information and belief, when a Partner retired, Defendant AGA sought to fill the newly vacant position.

91. Dr. Chalmers was a cardiac anesthesiologist.

92. Dr. Kennedy was a regional anesthesiologist.

93. Plaintiff was well-trained and had extensive experience in regional anesthesiology.

94. Despite Plaintiff's experience in regional anesthesiology, Defendant ANDRIAKOS told Plaintiff that she should improve her skills in cardiac anesthesiology, saying that by doing

so, she would improve her cachet with the Partners for when the next cardiac anesthesiologist vacated a Partnership Position.

95. Trusting Defendant ANDRIAKOS, Plaintiff asked if it would behoove her to complete a cardiac-anesthesiology fellowship.

96. Defendant ANDRIAKOS responded that Plaintiff would not need to complete a cardiac-anesthesiology fellowship to fill a cardiac anesthesiologist's position as a Partner.

97. Rather, Defendant ANDRIAKOS suggested that Plaintiff become certified to perform Trans Esophageal Echocardiograms (at times "TEE"), a component of cardiac anesthesiology.

98. Towards that end, Plaintiff took multiple TEE courses in locations as far away as Chicago and San Diego.

99. Plaintiff also performed almost 150 TEEs with cardiologists in the Capital Region of New York, at times under the tutelage of Dr. Chalmers.

100. Plaintiff took these initiatives regarding TEE training in addition to her standard workload for Defendants, including all of her time on call.

101. Through these efforts, Plaintiff gained a basic TEE certification.

102. Accordingly, in or around 2014, Plaintiff informed Defendant ANDRIAKOS that she had earned a basic TEE certification and had applied to take the advanced TEE exam.

103. Defendant ANDRIAKOS replied that Plaintiff would need at least a 6-month fellowship in cardiac anesthesiology if she wanted to become a Partner.

104. Plaintiff was stunned, because Defendant ANDRIAKOS had specifically told Plaintiff that she would not need a fellowship in cardiac anesthesiology to become a Partner.

105. Undeterred, Plaintiff commenced looking into cardiac-anesthesiology fellowships.

10

106. In or around 2014, Plaintiff began making arrangements to enroll in a cardiac-anesthesiology fellowship in Buffalo. She planned to start in the summer of 2015.

107. Later, in or around 2014, Plaintiff negotiated her next approximately 3-year contract with Defendant ANDRIAKOS (the "2014 Negotiation").

108. As the 2014 Negotiation approached, Plaintiff dared to hope and even believe that her approximately 5 years of hard work and additional training would pay off.

109. However, Defendants stifled Plaintiff's ambitions again.

110. During the 2014 Negotiation, Defendant ANDRIAKOS asked Plaintiff if she would help cover some of his on-call shifts at the Saratoga Facilities.

111. As Defendant AGA needed help with coverage, Plaintiff agreed to help—even though she had previously moved away from Saratoga at Defendants' behest.

112. Plaintiff reasoned that being a team player would only enhance her chances of being made Partner, relying on Defendant ANDRIAKOS' prior enumeration of the factors considered.

113. Defendant AGA later increased the frequency with which Plaintiff was on call at Samaritan Hospital in Troy to a 48-hour weekend call once every 5 weeks and a 24-hour mid-week call once every 5 weekdays.

114. In addition, Plaintiff was regularly on call at the Saratoga Facilities for approximately 12 or 13 hours once or even twice per week.

115. At times, Plaintiff was on call even more frequently than described.

116. Upon information and belief, Plaintiff was the only physician who was required to be on call at Samaritan Hospital and the Saratoga Facilities.

117. However, Plaintiff was not compensated for being on call more frequently than her contract required.

11

118. Although Plaintiff was ambivalent about performing extra work to the exclusion of spending more time with her family and young children, Plaintiff remembered Defendant ANDRIAKOS' assurances that she would be considered for a Partnership Position.

119. During the 2014 Negotiation, Plaintiff asked why she was consistently asked to do more work than her colleagues, at more locations, and with more unfavorable schedules.

120. Defendant ANDRIAKOS responded by asking Plaintiff, in sum and substance, "Do you want a partnership or mothership?"

121. Plaintiff was outraged at the insinuation that a mother could not be a Partner at Defendant AGA.

122. Moreover, many of the Partners at Defendant AGA were fathers.

123. Plaintiff resented that Defendant ANDRIAKOS invoked outdated gender stereotypes during her employment-contract negotiation.

124. During the 2014 Negotiation, Plaintiff told Defendant ANDRIAKOS that—as per his suggestion—she intended to start a fellowship in cardiac anesthesiology in the summer of 2015 in Buffalo, so as to better position herself to fill the void left by any upcoming retirements by cardiac anesthesiologists.

125. Defendant ANDRIAKOS told Plaintiff not to bother enrolling in the fellowship as Defendant AGA would be hiring 3 new Partners who were fellowship-trained cardiac anesthesiologists.

126. Naturally, all of 3 of these new Partners were men.

127. Plaintiff was crestfallen, despondent that Defendants had pulled the rug out from under her. Plaintiff felt that all the effort and time she spent away from her family and small children had been for naught.

128. After Plaintiff expressed her disappointment, Defendant ANDRIAKOS urged Plaintiff to remain with Defendant AGA.

129. Defendant ANDRIAKOS told Plaintiff that the next open Partnership Position would require skills in regional anesthesiology.

130. Defendant ANDRIAKOS further assured Plaintiff that more Partner retirements would be upcoming.

131. In or around 2015, upon Dr. Chalmers' and Dr. Kennedy's respective retirements, Defendant AGA hired male physicians as Partners.

132. Plaintiff was extremely distressed that the positions she sought continued to be filled by men.

133. Plaintiff still clung to hope she would become a Partner eventually.

134. As discussed, Defendant ANDRIAKOS had suggested that Defendants would prize regional-anesthesiology skills when considering who to make Partner next.

135. As such, Plaintiff underwent training in regional anesthesiology.

136. For example, between approximately November 2015 and May 2016, Plaintiff underwent extensive training—at times with Defendant ANDRIAKOS—to improve her already impressive regional anesthesia skills.

137. Additionally, in or around May 2016, Plaintiff completed an Ultrasound-Guided Regional Anesthesia Education and Clinical Training Portfolio from the American Society of Anesthesiologists and the American Society of Regional Anesthesia and Pain Medicine, reflecting her notable experience and dedication to always improving her clinical skills.

<u>Defendant WURL Sexually Harasses Plaintiff and Threatens Her for Rebuffing Him</u>

138. In or around 2015, Defendants' discrimination against Plaintiff metastasized, when Defendant WURL began making unwanted and unwelcome sexual advances towards Plaintiff.

139. The acuity of this sexual harassment increased over the years.

140. In or around the summer of 2019, Defendant WURL sharply escalated his sexual advances towards Plaintiff.

141. Defendant WURL began regularly complimenting Plaintiff on how she looked and what she wore.

142. While doing so, Defendant WURL also repeatedly touched Plaintiff's arms and clothing, deeply distressing Plaintiff.

143. Plaintiff wanted to more firmly object to Defendant WURL but was anxious about being viewed as a "problem" if she spoke up. Plaintiff was well aware that there were no female Partners working for Defendant AGA and was extremely apprehensive about the effect a sexual harassment complaint would have on her chances of becoming Partner.

144. Plaintiff was trapped between her ambition to become a Partner and her right to be free from Defendant WURL's degrading treatment.

145. On or about September 8, 2019, Plaintiff and Defendant WURL attended a colleague's wedding celebration.

146. At this celebration, Defendant WURL came uncomfortably close to Plaintiff.

147. When Plaintiff told Defendant WURL that he had come too close to her, Defendant WURL told Plaintiff that his wife had left early.

14

148. Shortly afterwards, Defendant WURL approached Plaintiff, touched Plaintiff's waist, leaned over Plaintiff's shoulder, and asked Plaintiff what she had ordered to drink.

149. Defendant WURL's breath smelled strongly of alcohol.

150. Deeply unnerved, Plaintiff replied and then left Defendant WURL's vicinity.

151. For approximately an hour, Plaintiff attempted to avoid Defendant WURL and mingle with other guests, but Defendant WURL kept following her and attempting to strike up conversations with her.

152. Plaintiff believed that Defendant WURL was clearly drunk.

153. Eventually, Defendant WURL came up behind Plaintiff and grabbed her left buttock.

154. Shocked and outraged, Plaintiff moved to distance herself from Defendant WURL.

155. Still, Defendant WURL approached Plaintiff yet again.

156. Plaintiff told Defendant WURL that he was getting too close to her and acting inappropriately, but Defendant WURL kept behaving boorishly.

157. Unwilling to accept any more indignities, Plaintiff departed the celebration.

158. Although she desperately wanted to go home to her family, Plaintiff had previously promised a colleague a ride home. As such, Plaintiff advised the colleague that she was ready to depart.

159. Plaintiff was so horrified at the prospect of rejoining the festivities while Defendant WURL was there that she elected to await her colleague for approximately 45 minutes inside of her car rather than risk interacting with Defendant WURL.

160. Defendant WURL continued complimenting Plaintiff's appearance through approximately November of 2019.

161. Whenever Defendant WURL complimented Plaintiff's appearance, she attempted to avoid making a scene, but never gave a response that encouraged continued advances.

15

162. Then shockingly, in or around early November 2019, Defendant WURL retaliated against Plaintiff for consistently rejecting his sexual advances by threatening to revoke Plaintiff's privileges at the Saratoga Facilities unless she "changed." Plaintiff understood this to be a demand that she stop rejecting Defendant WURL's sexual advances.

163. Outrageously, Defendant WURL accused Plaintiff of taking too long on a patient's procedure and of consequently causing the patient to spend too much time in the post-anesthesia care unit.

164. However, as Plaintiff responded, the procedure had taken longer than normal because a nursing student had performed the procedure under Plaintiff's supervision.

165. Defendant WURL then claimed that the chief at Saratoga Surgery Center did not want Plaintiff working at Saratoga Surgery Center.

166. Approximately a few days later, however, Plaintiff asked the chief of Saratoga Surgery Center if Defendant WURL's assertion was true, and the chief denied it.

167. Defendant WURL's stated basis for threatening to revoke Plaintiff's privileges is patently pretextual, and it is clear that Defendant WURL threatened Plaintiff because she rejected his numerous inappropriate and unwanted sexual advances.

168. Defendant WURL retaliated against Plaintiff approximately 2 months after she rejected his drunken advances at the wedding and even more shortly after Plaintiff rejected Defendant WURL's subsequent verbal advances regarding her appearance and attire.

2019 Partnership Position Opens; Defendants Again Deny Plaintiff a Promotion

169. In or around 2017, given Plaintiff's experience as an obstetrician and with regional anesthesiology, Defendant ANDRIAKOS told Plaintiff that she would be responsible for anesthesiology associated with labor-and-delivery patients at Samaritan Hospital.

170. Defendant ANDRIAKOS also asked Plaintiff to handle several of his other responsibilities managing obstetric anesthesiology at Samaritan Hospital.

171. Plaintiff hoped that Defendant ANDRIAKOS' request for her to take on more responsibility was a step on her way to a Partnership Position.

172. In or around 2017, Plaintiff negotiated her 2018-2021 contract (the "2017 Negotiation") with Defendant ANDRIAKOS.

173. During the 2017 Negotiation, Plaintiff again asked Defendant ANDRIAKOS what would improve her chances of becoming a Partner.

174. This time, Defendant ANDRIAKOS reiterated that Defendant AGA would be needing a Partner with regional anesthetic skills.

175. In or around July 2018, Defendant WILKINS became the president of Defendant AGA.

176. In or around late 2019, Plaintiff learned that 2 Partnership Positions would open in the coming months.

177. As such, Plaintiff, told Defendant WILKINS that she wanted to fill one of these Partnership Positions.

178. By this time, Defendant AGA had approximately 22 Partners, all of whom were male.

179. During Plaintiff's employment with Defendant AGA to this point, at least 4 men became Partners at Defendant AGA.

180. Each of these 4 male Partners began working for Defendant AGA after Plaintiff started working for Defendant AGA.

181. Upon information and belief, Defendant AGA has never hired a female Partner, even though the overwhelming majority of its non-partnership physician positions were filled by females.

17

182. In the fall of 2019, Defendant AGA filled 1 of the 2 open Partnership Positions with a male physician with far less experience than Plaintiff.

183. Upon information and belief, this new Partner started working for Defendant AGA in July of 2018, only about 1 year earlier.

184. Given Plaintiff's experience and qualifications, particularly as compared to her similarly situated male colleagues who were given the opportunity to become Partners, Plaintiff was qualified to become a Partner at Defendant AGA.

185. Worse, Plaintiff even heard Defendant ANDRIAKOS diagnose the real reason why Plaintiff was not made Partner.

186. In or around October or November 2019, Plaintiff discussed this new hiring with Defendant ANDRIAKOS and another colleague. This colleague relayed that he took exception to Defendants having promoted a man whom the colleague viewed as less qualified than Plaintiff for a Partnership Position and decried the Partners as members of a "boys' club." He also said that Defendant ANDRIAKOS did not object to this characterization. Rather, according to this colleague, Defendant ANDRIAKOS attempted to justify Defendants' decisions by outrageously proclaiming, in sum and substance, "We don't want to deal with female drama." He also told Plaintiff that Defendant ANDRIAKOS further explained that he and some other Partners frequently vacationed together and that, in sum and substance, "We don't even take our wives."

187. Devastated, Plaintiff now understood that Defendants had strung her along for years with no intention of ever allowing her to become a Partner. Moreover, Defendants had told Plaintiff that frequently being on call was vital for anyone's prospects of being made Partner. Accordingly, she had sacrificed countless hours and days away from her family and young

children as she strove for a Partnership Position. Now, Defendants had elevated a younger male doctor with less experience and who had not made the same great contributions to Defendant AGA as Plaintiff.

<u>Plaintiff Complains of Discrimination and Sexual Harassment</u>
<u>and is Terminated in Retaliation for Opposing Discrimination</u>

188. On or about November 22, 2019, Plaintiff, now at her rope's end, sent an email to Defendant WILKINS, indicating her intent to resign from Defendant AGA.

189. Plaintiff explained that she was "deeply disappointed [to] have to leave your group after over a decade of my hard work, dedication of my time, experience, knowledge and skills, and demonstration of my loyalty to AGA."

190. Plaintiff was fed up with constantly being denied the Partnership Position for which she was qualified after striving to meet the conditions ostensibly set for her, only to have those requirements altered.

191. Plaintiff was also fed up with Defendant WURL's sexual harassment and bullying behavior. She was additionally angry at herself for having endured it, without making a very justifiable complaint, only to once again see a Partnership Position given to another man instead of her.

192. In the email, Plaintiff wrote that she would follow up with a formal letter of resignation.

193. Plaintiff never followed up with a more formal letter of resignation.

194. Shortly after sending this email, numerous physicians and nurses approached Plaintiff and asked her to stay with Defendant AGA.

195. After further reflection, Plaintiff decided that rather than quit and walk away from her nearly 11 years of dedicated employment, she would voice her complaint that she was discriminated against and continue to strive for a Partnership Position.

19

196. As such, on or about January 13, 2020, Plaintiff sent an email to Defendant WILKINS retracting her letter of resignation (the "Retraction Email").

197. In the Retraction Email, Plaintiff explained that she believed she was being passed over for promotion because of her sex/gender:

> I sent my resignation letter when I was very upset at being unfairly passed over for a promotion after working for over 10 years at the AGA. As a full-time call taking physician with OB experience and excellent regional anesthesia skills. As a female who has been dedicated and loyal to your group for many years, I feel I merited being approached first regarding this promotional opportunity. I believe I have always been very flexible and attentive to the group's needs including but not limited to taking multiple call positions at different facilities, working post call days and extra hours without submitting overtime, relocating my 24 and 48 hours calls to a different facility when AGA took over Samaritan Hospital, and also attending perinatal safety committee meetings and M & M meetings for the last 3 years, as well as being actively engaged in the training of Saratoga Surgery Center Nursing Staff.

198. Shortly afterwards, Defendant WILKINS telephoned Plaintiff and told her, in sum and substance, that Defendant AGA would need to rehire Plaintiff in order for her to keep working with Defendant AGA.

199. Upon information and belief, there was no basis for this claim.

200. Defendants have never explained the basis of this claim.

201. Upon information and belief, during the investigation, Defendant ANDRIAKOS told a colleague that Plaintiff was not and would not be promoted because, in sum and substance, "We don't want female drama."

202. On or about January 14, 2020, Defendant WILKINS replied via email: "The AGA Board will discuss and consider your offer to retract your resignation at the next AGA Board meeting."

203. The next board meeting was held in or around February 2020.

204. In the interim, Defendant AGA hired a law firm, Gleason, Dunn, Walsh & O'Shea, to investigate Plaintiff's complaints.

205. In or around late January 2020, an attorney from Gleason, Dunn, Walsh & O'Shea met with Plaintiff regarding Plaintiff's allegations of gender discrimination.

206. Plaintiff specifically informed the "Attorney" that Plaintiff felt she was being discriminatorily denied a Partnership Position.

207. Plaintiff also complained that Defendant WURL was sexually harassing and retaliating against her for spurning his advances.

208. Plaintiff repeatedly requested updates from the Attorney regarding the investigation to no avail.

209. Eventually, in or around February 2020, Plaintiff was apprised that her complaints were deemed unsubstantiated.

210. Plaintiff was not provided any information regarding the investigation's conclusions.

211. Plaintiff was never told why, despite her approximately 11 years of dedication and experience, she was consistently passed over for promotion.

212. No one ever explained to Plaintiff why all of the Partners working for Defendant AGA were men, or why she was never considered for the partnership track.

213. Upon information and belief, Defendant AGA did not address Plaintiff's complaints or employment status at its February 2020 Board Meeting.

214. Upon information and belief, Defendant AGA decided to terminate Plaintiff by not accepting the Retraction Email at its March 2020 Board Meeting.

215. A colleague present at the March 2020 Board Meeting advised Plaintiff that at the meeting, Defendant ANDRIAKOS angrily accused Plaintiff of making, in sum and substance, a

"bullshit complaint." This colleague further told Plaintiff that this was why Defendant AGA decided to terminate Plaintiff. As such, Defendant ANDRIAKOS' directly explained Defendants' retaliatory motivation for terminating Plaintiff.

216. Beyond Defendant ANDRIAKOS' direct explanation of Defendants' retaliatory motive, Plaintiff had again complained of discrimination during the investigation in or around late January 2020. The temporal proximity between the decision to terminate Plaintiff and her complaints of discrimination make clear that Defendants terminated Plaintiff because she complained of discrimination.

217. Despite Defendant's decision to terminate Plaintiff, as of March 29, 2020, Plaintiff had not yet received a response to her January 13 Retraction Email.

218. As such, Defendant AGA prevented Plaintiff from planning for the future.

219. Meanwhile, the COVID-19 Pandemic struck and began ravaging the Capital Region of New York where Plaintiff and her colleagues worked.

220. Consequently, Plaintiff and her colleagues had no choice but to treat countless critically— and all too frequently mortally—ill patients, while potentially exposing themselves and their loved ones to this novel scourge.

221. On or about April 10, 2020, Defendant AGA finally deigned to respond to Plaintiff—albeit unlawfully—by emailing Plaintiff a letter signed by Defendant WILKINS in which Defendants terminated Plaintiff (the "Termination Letter").

222. In part, the Termination Letter stated that, "While we appreciate your service with AGA, under the present circumstances we are not in a position to permit you to rescind your resignation, nor are we able to otherwise extend your employment past the current end date of May 20, 2020."

223. Although the "present circumstances" were not explained, presumably Defendants intended to invoke the COVID-19 Pandemic, which has caused significant, worldwide economic upheaval, including in the Capital Region.

224. However, as of April 14, 2020, Defendant AGA's website stated "Full-Time [anesthesiologist] positions available."[2] Hence, Defendant AGA does not appear to have been under financial strain at the time.

225. It is also unclear how Defendants determined that Plaintiff's employment had a "current end date of May 20, 2020," as Plaintiff was under contract with Defendants through approximately August 31, 2021, and she had rescinded her resignation.

226. The only plausible explanation of what the "present circumstances" were is that Plaintiff complained of discrimination.

227. Defendants refused to accept Plaintiff's Retraction Email because Plaintiff complained of discrimination in the Retraction Email.

228. Defendants knew or should have known of the discriminatory conduct and failed to take corrective measures within their control.

229. But for Defendant ANDRIAKOS' position at Defendant AGA, Defendant ANDRIAKOS would not have been able to subject Plaintiff to the discriminatory treatment alleged above.

230. But for Defendant WILKINS' position at Defendant AGA, Defendant WILKINS would not have been able to subject Plaintiff to the discriminatory treatment alleged above.

231. But for Defendant WURL's position at AGA, Defendant WURL would not have been able to subject Plaintiff to the discriminatory treatment alleged above.

---

[2] Anesthesia Group of Albany, Careers – Anesthesiologist, https://www.agapc.com/careers-anesthesiologist/ (last accessed May 15, 2020).

23

232. Plaintiff was repulsed, offended, disturbed, humiliated, and disgusted by this blatantly unlawful and retaliatory termination.

233. Defendants retaliated against Plaintiff because Plaintiff objected to Defendant ANDRIAKOS' discriminatory and unlawful conduct.

234. Defendants retaliated against Plaintiff because Plaintiff objected to Defendant WURL'S discriminatory and unlawful conduct.

235. Defendants retaliated against Plaintiff because Plaintiff objected to Defendant WILKINS' discriminatory and unlawful conduct.

236. Defendants retaliated against Plaintiff because Plaintiff objected to Defendant AGA'S discriminatory and unlawful conduct.

237. Plaintiff's objections to this discriminatory conduct was a motivating factor in their decision to terminate and to not promote Plaintiff.

238. Defendants created a hostile work environment which unreasonably interfered with Plaintiff's ability to perform Plaintiff's job.

239. The above are just some of the ways Defendants regularly and continually harassed, discriminated against, and retaliated against Plaintiff while employing Plaintiff.

240. Defendants treated Plaintiff this way solely due to Plaintiff's sex/gender (female).

241. Defendants acted intentionally and intended to harm Plaintiff.

242. Defendants unlawfully discriminated against, retaliated against, humiliated, degraded, and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress, and loss of income.

243. Plaintiff's performance was, upon information and belief, above average and satisfactory while working for Defendants.

244. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of bonus, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

245. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

246. Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

247. As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**First Cause of Action: Hostile Work Environment**
**Under Title VII**
**(Not Against Individual Defendants)**

248. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

249. Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e–2(a), titled "employer practices," provides that:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

250. Defendant AGA violated the sections cited herein as set forth.

**Second Cause of Action: Discriminatory Discharge**
**Under Title VII**
**(Not Against Individual Defendants)**

251. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

252. Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e–2(a), titled "employer practices," provides that:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

253. Defendant AGA violated the sections cited herein as set forth.

**Third Cause of Action: Failure to Promote**
**Under Title VII**
**(Not Against Individual Defendants)**

254. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

255. Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e–2(a), titled "employer practices," provides that:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

26

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

256. Defendant AGA violated the sections cited herein as set forth.

### Fourth Cause of Action: Retaliation
### Under Title VII
### (Not Against Individual Defendant)

257. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

258. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

259. Defendant AGA violated the sections cited herein as set forth.

### Fifth Cause of Action: Hostile Work Environment
### Under the New York State Executive Law
### (Against all Defendants)

260. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

261. New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

262. Defendants violated the section cited herein as set forth.

**Sixth Cause of Action: Discriminatory Discharge**
**Under the New York State Executive Law**
**(Against all Defendants)**

263. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

264. New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

265. Defendants violated the section cited herein as set forth.

**Seventh Cause of Action: Failure to Promote**
**Under the New York State Executive Law**
**(Against all Defendants)**

266. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

267. New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

268. Defendants violated the section cited herein as set forth.

**Eighth Cause of Action: Aiding and/or Abetting Discrimination
Under the New York State Executive Law
(Not Against Defendant AGA)**

269. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

270. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

271. Defendants ANDRIAKOS, WILKINS, and WURL each violated this statute as set forth.

**Ninth Cause of Action: Retaliation
Under the New York State Executive Law
(Against All Defendants)**

272. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

273. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

274. Defendants violated the section cited herein as set forth.

**Tenth Cause of Action for Battery
Under the New York State Common Law
(Against Defendant WURL)**

275. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

276. By his actions as set forth above, Defendant WURL subjected Plaintiff to battery.

277. Defendant WURL intentionally subjected Plaintiff to harmful and/or offensive physical contact.

29

278. Plaintiff sustained damages as a result of this harmful and/or offensive contact.

279. Plaintiff is entitled to the maximum amount allowed under this doctrine, including but not limited to, punitive damages.

### Eleventh Cause of Action for Assault
### Under the New York State Common Law
### (Against Defendant WURL)

280. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

281. By his actions as set forth above, Defendant WURL subjected Plaintiff to assault.

282. Defendant WURL intentionally placed Plaintiff in reasonable apprehension of an imminent harmful and/or offensive physical contact.

283. Plaintiff sustained damages as a result of this reasonable apprehension of the same.

284. Plaintiff is entitled to the maximum amount allowed under this doctrine, including but not limited to, punitive damages.

### Jury Demand

285. Plaintiff requests a jury trial on all issues to be tried.

### Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, and the New York State Human Rights Law, in that Defendants discriminated against Plaintiff based on Plaintiff's sex/gender, resulting in her being subjected to a hostile work environment and being denied a promotion to which she was entitled, and further Defendants retaliated against Plaintiff for complaining of discrimination, ultimately  resulting in Plaintiff's wrongful termination;

30

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices and negligence;

C.  Awarding Plaintiff compensatory damages for physical, mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated:  New York, New York
November 5, 2020

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

By:  _____
Steven Fingerhut
H. Joseph Cronen
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
(212) 248-7431
sfingerhut@tpglaws.com
jcronen@tpglaws.com

13